**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BEST MEDICAL INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **2:10-cv-1043-TFM** |
| | ) | |
| **v.** | ) | **Filed Electronically** |
| | ) | |
| **ACCURAY, INC.,** | ) | |
| | ) | |
| **DEFENDANT.** | | |

**BEST MEDICAL INTERNATIONAL, INC.'S RESPONSE TO ACCURAY, INC.'S
OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION
ON CLAIM CONSTRUCTION**

## I.      INTRODUCTION

In its Objections (Doc. No. 154), Accuray takes issue with nearly all of the recommendations in the Special Master's 187-page Report and Recommendation on Claim Construction (Doc. No. 149) ("Report"), including that the Report is incomplete.  Accuray's arguments are unavailing and its Objections should be overruled.[1]

The Report is an extensive, thorough, well reasoned and supported analysis and application of claim construction principles.  The Report includes:  (a) a detailed analysis of the patent-in-suit; (b) a discussion of the disputed claim terms; (c) a full recitation of the parties' arguments and proposed constructions, from both the hearing and the pre-hearing briefing; (d) a complete discussion of applicable Federal Circuit precedent on claim construction principles; and (e) specific recommendations for the Court's Claim Construction Opinion.

Accuray's Objections to the Report simply re-hash arguments made to the Special Master on multiple occasions prior to and during the claim construction process, which despite

---

[1] It also bears mention that the Special Master was agreed to by the parties, and in fact, was proposed by Accuray.

Accuray's suggestions to the contrary, were rejected by the Special Master in view of *Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005)*.

While Accuray claims that only its suggested claim construction comports with the holding in *Phillips* and that the "Report is incomplete; it failed to construe all of the disputed claim terms for Claims 25 and 29; and narrowed the claim construction dispute without the parties' consent," that is simply not the case. The Report recommends a claim construction that wholly comports with the holdings and teachings of *Phillips*. As such, the Defendants' Objections should be overruled, and Best Medical respectfully submits that this Court adopt the Report as the Opinion of the Court in its entirety.

## II.   <u>GENERAL DISCUSSION</u>

Accuray sets forth its objections in a 42-page brief including 8 sections containing 14 subsections, each of which sets forth some form of objection to the Report.  This response will address each argument in the order asserted by Accuray.  However, Best Medical begins this Response with a general discussion of Accuray's Objections and the Report.

Accuray incorrectly asserts that it was not permitted to fully present its arguments on certain issues (Objections, p. 8).  Even a cursory review of the Report refutes this assertion. Looking at the Report, seven pages (pp. 33-40) identify and describe both parties' arguments regarding whether claim 25 is limited to the SARP algorithm.  The Report also contains an additional three pages (pp. 43-46) again addressing Accuray's contentions regarding whether claim 25 is limited to the SARP algorithm.  Similarly, with respect to the term "cost function" and whether it is limited to the cost function described in the specification, the Special Master again identified and described the parties' proposed constructions and arguments (pp. 102-106). With respect to "changing the beam weight," the Report identified and described the parties'

proposed construction and arguments at pages 144-151.  In short, Accuray's arguments were heard, understood, discussed and thoughtfully and thoroughly addressed by the Special Master. Nonetheless, Accuray spends the bulk of its voluminous arguments in the Objections nitpicking and finding fault with individual, and sometimes minor, issues that were comprehensively addressed by the Special Master, only to reach the conclusion that, contrary to Federal Circuit precedent, the preferred embodiment described in the specification should be read into claim 25.

Moreover, the discussion of the parties' arguments and contentions in the Report is not limited to the presentations made by counsel during the claim construction hearing.  Rather, the Report contains specific quotations and summaries of the arguments raised by the parties during the extensive pre-hearing briefing process.  Accuray submitted a 69-page Responsive Claim Construction Brief (Doc. No. 138) and a 53-page Sur-Reply Claim Construction Brief (Doc. No. 146), prior to the claim construction hearing.  Further, the parties both submitted to the Special Master and the Court hard copies of the PowerPoint presentations used by counsel during the claim construction hearing, including the 190-page claim construction presentation offered by Accuray.[2]

After submitting over 300 pages of argument and evidence, and several hours of counsel presentation, Accuray cannot seriously contend that the Special Master did not permit Accuray to present a full argument on any issue related to claim construction.  In fact, the Special Master confirmed on the record that a second day was set aside for the claim construction hearing if the parties needed the time to make their presentations.  *See* Transcript from May 16, 2012 claim construction hearing (Doc. No. 147) ("Transcript") at p. 65.

---

[2] Accuray also submitted an additional 34 pages of slides offered as its claim construction tutorial.

III.    **THE SPECIAL MASTER DID NOT ERR IN RECOMMENDING THAT THE TERM "COST FUNCTION" IN CLAIM 25 IS NOT LIMITED TO THE COST FUNCTION RECITED IN THE SPECIFICATION AT COL. 13, LINES 4-39**

A.    **The Special Master did not fail to construe the cost function as a limitation based upon the patentee acting as his own lexicographer.**

The claim construction principle regarding the patentee acting as his or her own lexicographer applies:  (1) when the patentee has clearly set forth an explicit definition of the term that is different from its ordinary meaning; or (2) when the patentee has disavowed or disclaimed the scope of coverage by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.  *See* Phillips, 415 F.3d at 1320; *Merck & Co., Inc. v. Teva Pharmaceutical USA, Inc*., 395 F.3d 1364, 1370 (Fed. Cir. 2005).  Neither is present in the '283 patent.

Accuray argues that the formulas and variables listed in columns 4 and 13 of the specification of the '283 Patent serve as an explicit definition of the term "cost function." However, Accuray never argued that one skilled in the art would have understood the term "cost function" as used in claim 25 to mean the exact formulas and variables listed in certain portions of the specification.  Report at pp. 106-107.

In short, the Special Master recommended that the term "cost function" be construed as its ordinary and customary meaning.  Moreover, the Special Master concluded that the ordinary and customary meaning of the term "cost function" is not limited to the formulas and variables set forth at column 13, lines 4-39.  Report at pp. 142-143.  This conclusion is supported by *Phillips*.

Accuray's argument that this conclusion was in error ignores the portion of the specification immediately preceding the formulas, which describes a more general use of the term:  "The cost function is an analytical determination of whether, when any change is made to

4

the strengths of the beams being used to treat the patient, the resulted dose distribution is closer to the result desired by the user." Col. 13, lines 1-4.

Accuray also ignores the evidence it offered during the hearing: "Accuray's arguments regarding the technology indicate that the language of claim 25 was well-known and understood by persons of ordinary skill in the art -- including the claim term 'cost function.'" Report at p. 107.  As stated in the Report: "Accuray concedes that there were at the time of filing a number of mathematically-described optimization goals generally known as 'cost functions,' and that those cost functions did not necessarily include the formulas and variables described in column 13." *Id.* at p. 108.  Further, the Special Master determined:

> Some cost functions were apparently more usefully [sic] than others for particular types of optimization algorithms, but the "ordinary and customary meaning" of the term "cost function" nevertheless connotated a wide variety of mathematical functions used for optimization, not just the mathematical function of column 13.

*Id.* at pp. 108-109.

The Special Master, therefore, correctly concluded that the term "cost function" as used in claim 25 is not limited to the formulas and variables in column 13, lines 4-39 of the specification, because the patentee did not provide a special definition for "cost function" or disavow the ordinary scope of that term.

Accuray further argues that the patentee defined "cost function" "by implication." Objections, p. 6.  In support of its assertion, Accuray cites to *AstraZeneca LP v. Apotex, Inc.,* 633 F.3d 1042, 1051-52 (Fed. Cir. 2010), a case which provides general guidance concerning claim construction principles but does not require that the preferred embodiment described in the specification of the '283 patent be read into claim 25.  Instead, in *AstraZeneca* the court embarked on a fact intensive examination of the intrinsic record and expert testimony, and concluded:  "Considered together, the intrinsic evidence and expert testimony support the

conclusion that a person skilled in the art would have understood the term 'budesonide composition' to mean 'budesonide dispersed in a solvent in the form of a solution or suspension.'" *AstraZeneca,* 633 F.3d at 1052.

In the Report in this case, the Special Master analyzed the intrinsic evidence and declaration submitted made by Accuray's expert, Dr. Rosen, much like the court in *AstraZeneca* did, and the Special Master concluded that the term "cost function" should be given its ordinary and customary meaning based, at least in part, on Dr. Rosen's Declaration that cost functions other than those described in the specification were known in the art. *See* Report at p. 108. The Special Master also relied on more general uses of the term in the specification in forming his conclusions. *See, e.g., id.* at pp. 120-21. Thus, the Special Master performed a fact intensive and thorough analysis that was analogous to that performed by the court in *AstraZeneca* and, based on the facts of the instant case, the Special Master reached the correct result.

## B.     Accuray is incorrect that BMI asserted a novel argument during the claim construction hearing and that the Special Master allegedly erred for failing to consider it.

Contrary to Accuray's assertions, counsel for Best Medical did not assert a new argument during the claim construction hearing, but rather, quoted from the specification:

> However, the cost functions used in existing methods do not account for the structure volumes as a whole, relying merely on costs related to discreet points within the structure, and further do not account for the relative importance of varying surrounding structure types.

*See* Col. 3, lines 25-29 and Transcript at pp. 98-99 (where language above was quoted verbatim).

In light of the fact that this is taken directly from the specification, Accuray's characterization of the reference to "structure volumes as a whole" as being an "admission" or "novel" is not credible. Moreover, the Special Master specifically addressed the above-quoted

language of the specification at page 120 of the Report.  The Special Master looked at this precise language, as well as other language in the specification and concluded:

> It is further clear from the patentees' disclosure of the claimed invention that they did not provide a special definition for "cost function" or disavow the ordinary scope of that term.

Report at p. 120.

Accordingly, Accuray's argument that the Special Master failed to consider this language is without merit and is an inaccurate recitation of the record.

Accuray further states that the "Special Master did not allow Accuray to present its argument on the cost function term, even though it is arguably the most important term in dispute."  Objections at p. 8.  Such a statement is wholly inaccurate and a mischaracterization of the record in this case.  First, as set forth above, Accuray has submitted over 300 pages of information and argument to the Special Master and the Court which set forth Accuray's positions in incredible detail.  Second, the Special Master did not in any way prohibit or restrict Accuray's counsel from arguing anything at the claim construction hearing.  In fact, the Special Master specifically stated:  "I don't really need to shortcut it.  What I'm really trying to do is get at the core underlying dispute between the parties."  Transcript at p. 141.  Further, as the transcript makes clear, it was counsel's choice as to how to argue its points.  In fact, it was made clear prior to and during the claim construction hearing that there were no time limitations placed on counsel, and in fact an entire second day was reserved for the claim construction hearing:

> Ms. Jellins:    Could I ask one question, which I missed the discussion this morning before this procedure started, and I understand you wanted to cover as much as possible today, will we have time tomorrow morning to wrap up, if necessary?
>
> Mr. Petersen:   Yes.  Actually, you have two days.  I guess I was encouraging the parties this morning, since we are not going to take testimony, that because you have the time, you don't necessarily

> need to use it.  You have it and you can use it, but there is
> nobody requiring you to use it.

Transcript at p. 65. See also, Special Master's Claim Construction Hearing Order (Doc. No. 62).

Finally, Accuray's argument has always been and continues to be that the term "cost function" in claim 25 of the '283 patent should be limited to the formulas and variables set forth in column 13, lines 4-39 of the specification.  The Special Master quoted Accuray's proposed construction at page 102 of the Report, and discussed Accuray's arguments in detail at pages 103-105 of the Report.

Accordingly, there is no reasonable argument that the Special Master failed to understand and appreciate Accuray's argument, but rather, that the Special Master simply rejected it, applying claim construction principles as enunciated by the Federal Circuit.  Thus, Accuray's objection that it was somehow prevented from fully arguing its position as to construction of the term cost function is similarly without merit.

**C.    The Special Master did not conclude that the phrase "cost function of the present invention" is "boilerplate."**

Accuray mischaracterizes the Special Master's Report in asserting that the Special Master concluded that the phrase "cost function of the present invention" was "boilerplate."  What the Special Master actually stated was:

> Those[3] -- and other -- cases may be compared or contrasted on their facts,
> but what is clear is that the mere recitation of "the present invention"
> language is not dispositive.  As with evaluating so-called "boilerplate"
> language, whether "the present invention" limits claim scope depends on
> how the phrase is used in the entirety of the intrinsic record.  Here, in view
> of the entire intrinsic record, the "present invention" language that
> Accuray points to cannot be reasonably viewed as limiting "cost function"
> to the formulas and variables of column 13.  It seems clear that the
> formulas and variables of column 13 were intended as part of the

---

[3] The cases cited and discussed by the Special Master, and referenced in the above quote, include *Edwards Lifesciences LLC v. Cook, Inc.*, 582 F.3d 1322 (Fed. Cir. 2009) and *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 112 (Fed. Cir. 2011).

> patentees' required disclosure under §112(1), including a disclosure of the applicants' known best mode for practicing the invention, as opposed to a disclosure of the limits of the claimed invention.

Report at p. 125 (emphasis added).

As can be seen from the quote, the Special Master drew an analogy between "boilerplate" language and "the present invention" language. The Special Master did <u>not</u> conclude, as asserted by Accuray, that "the cost function of the present invention" throughout the specification is merely "boilerplate." *See* Objections at p. 10.

After a discussion of applicable Federal Circuit authority (pages 122-125), the Special Master correctly concluded that the use of the phrase "the present invention" in the specification was not a limitation in view of the <u>entire</u> intrinsic record. The Special Master explained this recommendation by looking at the use of the phrase "the present invention" in connection with other disclosed subject matter in the '283 patent. *See* Report at pp. 125-134. In a thorough and detailed analysis, the Special Master provided specific examples as to how the phrase "the present invention" is used in connection with most of the disclosed subject matter, and is not limited solely to the term "cost function." Accordingly, the Special Master was correct in recommending that the phrase "the present invention" was not used in the specification as a limitation to the disclosed "cost function."

**D.      A skilled artisan would not understand that other cost functions would not be compatible with the functional limitations of claims 25 and 29.**

Despite the fact that Accuray conceded that there were at the time of filing a number of mathematically-described optimization goals generally known as "cost functions," and that those cost functions did not necessarily include the formulas and variables described in column 13, Accuray argues that one skilled in the art would understand that only the formulas and variables

in column 13, lines 4-39 could be used in the invention, and that a contrary conclusion (*i.e.*, the conclusion rejected by the Special Master) would be "nonsensical."

In doing so, Accuray asks the Court to apply Accuray's litigation expert's opinions over the unambiguous language in the specification and the claims of the '283 patent.

As discussed above, the specification uses the term "cost function" in a more general sense. First, the specification uses the term "cost function" in describing prior art techniques: "[e]xisting methods and apparatus utilize a computational method of establishing optimized treatment plans based on an objective cost function that attributes costs of radiation of various portions of both the tumor and surrounding tissues, or structures." *See* Col. 3, lines 17-21. "However, the cost functions used in existing methods do not account for the structure volumes as a whole, relying merely on costs related to discreet points within the structure, and further do not account for the relative importance of varying surrounding structure types." *See* Col. 3, lines 25-29. Second, the specification defines the cost function in general terms: "The cost function is an analytical determination of whether, when any change is made to the strengths of the beams being used to treat the patient, the resultant dose distribution is closer to the result desired by the user." Col. 13, lines 1-4. Third, the other claims of the '283 patent show the use of both a specific definition of the term "cost function," while others, like claim 25, use the term more generally. As stated in *Phillips*, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Phillips* at 1314, *citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

As found by the Special Master, independent claims 1, 22, 29 and 36 use the term cost function in much the same way as does claim 25, *i.e.*, without reference to the formulas and

variables of column 13.  Report at pp. 109-113.  Further, various dependent claims indicate that the term cost function is not *per se* limited to the formulas and variables of column 13.  Report at pp. 113-119.  These claims are in direct contrast to claim 2, which uses the precise formulas and variable from column 13, lines 4-39 and claims 14 and 18, which recite much of what the cost function includes, but without the formulas and variables.  Finally, claim 35 indicates that "cost function parameters" may vary.

Accordingly, the Special Master did not err in using the specification and claims (*i.e.*, the intrinsic record) of the '283 patent to construe the claims over litigation-based extrinsic evidence. In other words, the Special Master construed the claims in accordance with *Phillips* and other Federal Circuit precedent.

**E.    The Special Master did not err in analyzing the language of asserted and un-asserted claims in construing claim 25.**

Accuray argues that the Special Master misapplied the limited doctrine of claim differentiation.  Objections at p. 16.  However, Accuray mischaracterizes the analysis performed by the Special Master.  After analyzing the language of other claims of the patent (*see* Report at pp. 109-119), the Special Master stated:

> **Again, differentiation among claims may have evolved** from what Chief Judge Markey characterized as having "immutable and universally applicable status comparatively rare among rules of law," **to a "guideline;" nevertheless, asserted and non-asserted claims remain an objective source, outside the scope of litigation-induced proposed constructions,** for evaluating the scope of the term "cost function."  Other asserted and non-asserted claims indicate that the "cost function" of claim 1 is not limited to the equations recited in claim 2.  Particularly in view of the largely parallel elements of claims 1 and 25, the above comparison indicates that the "cost function" recited in claim 25, like the "cost function" of claim 1, should not be limited to the formulas shown in column 13, lines 4-39.  *See Curtiss-Wright Flow Control*, 438 F.3d at 1380 ("Beyond the independent/dependent claim scenario, this court has characterized claim differentiation more generally, *i.e.*, as the 'presumption that each claim in a patent has a different scope.'" (*quoting Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004));

> *Phillips*, 415 F.3d at 1314 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."). Similarly, claim 25 should not be limited to the cost function calculations of claim 14, for example.  Indeed, as claim 35 indicates, a "cost function" may have a variety of "different cost function parameters."

Report at p. 119 (emphasis added).

As described above, the Special Master did not "misapply" the doctrine of claim differentiation.  Rather, the Special Master used the asserted and non-asserted claims as an "objective source" to evaluate the specific language of claim 25.  Moreover, the Special Master's analysis of asserted and non-asserted claims was used solely as additional, objective evidence to support the Special Master's recommendation that the term "cost function" is not limited to the formulas and variables disclosed in column 13 of the specification.  This is precisely how the Federal Circuit advises application of the doctrine of claim differentiation.

In fact, the Special Master reached his recommendation based upon an analysis of the claim language itself, the ordinary and customary meaning of the term "cost function," the use in the specification of the phrase "the present invention," the Detailed Description of the Invention, the Summary of the Invention, the Background of the Invention, the Abstract and the prosecution history.  *See* Report at pp. 101-142.

Accuray's attempt to nitpick the Report by claiming that the doctrine of claim differentiation was misapplied is simply incorrect and not supported by the record.

**F.     The Special Master did not err in concluding that the cost function of column 13 is only a preferred embodiment.**

In the Report, the Special Master acknowledged that the cost function of column 13 is the only cost function disclosed in detail in the '283 Patent.  Accuray argues that the Special Master erred in concluding that the cost function of column 13 is only a "preferred" embodiment.  However, as stated by the Special Master:  "The Federal Circuit has 'expressly rejected the

contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.'"  Report at p. 122, *citing Phillips*, 415 F.3d at 1323.

Accuray is apparently now arguing that despite the fact that the cost function formulas and variables disclosed in the specification are the only cost function formulas and variables disclosed in the specification in detail, the disclosure is <u>not</u> a preferred embodiment.  However, Accuray fails to identify any other embodiments of the cost function set forth in the specification.  Moreover, the specification itself states:

> While the invention will be described in connection with the preferred embodiment, it will be understood that it is not intended to limit the invention to that embodiment.  On the contrary, it is intended to cover all alternatives, modifications, and equivalence, as may be included within the spirit and scope of the invention <u>as to be defined by claims</u> to be filed in a non-provisional application.

Col. 8, lines 51-57 (emphasis added).

In its briefing prior to the claim construction hearing, Accuray argued that "a construction that excludes a preferred (or only) embodiment is rarely if ever correct."  *See* Accuray Responsive Brief (Doc. No. 146) at p. 26, *citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).  However, such reliance here is misplaced.  The Report does not suggest a construction that <u>excludes</u> the preferred or only embodiment, but rather, simply states that the preferred embodiment does not serve as a <u>limitation</u> to claim 25.

Accordingly, Accuray is incorrect in asserting that the Special Master erred in finding that the formulas and variables described in column 13 of the specification is a description of a preferred embodiment, and further that the preferred embodiment serves to limit claim 25.

**G.      The Special Master's Report does not fail to construe the term "cost function."**

Accuray argues that the Special Master failed to provide a construction of the term "cost function," and only "defines what the cost function is ***not***, but does not define what the cost function ***is***."  Objections at p. 19 (emphasis in original).  Accuray is again incorrect.

As set forth above, the Report on numerous occasions makes clear that the Special Master recommended that the term "cost function" be construed in accordance with its ordinary and customary meaning.  In particular, the Report states:

- "On its face, therefore, claim 25 is not limited to the cost function of column 13.   Indeed, as with SARP, Accuray's arguments regarding the technology <u>indicates that the language of claim 25 was well-known and understood by persons of ordinary skill in the art</u> -- <u>including the claim term "cost function</u>."  (Report at p. 107; emphasis added)

- "Accuray concedes that there were at the time of filing a number of mathematically-described optimization goals generally known as "cost functions," and that those cost functions did not necessarily include the formulas and variables described in column 13.  Some cost functions were apparently more useful than [sic] others for particularly types of optimization algorithms, but the "<u>ordinary and customary meaning" of the term "cost function" nevertheless connoted a wide variety of mathematical functions used for optimization, not just the mathematical function of column 13</u>." (Report at pp. 108-109; emphasis added)

- "The patentees use the term 'cost function' in describing prior art techniques, indicating that <u>the term 'cost function' had an accepted meaning in the art at the time of filing</u>."  (Report at p. 120; emphasis added)

- It is further clear from the patentees' disclosure of the claimed invention that they <u>did not provide a special definition for "cost function," or disavow the ordinary scope of that term</u>."  (*Id.*; emphasis added)

- "Indeed, the description of what the optimizer's 'cost function' does, namely, 'ensure that an iterative change in the beam weight would not result in an unacceptable exposure to the volumes of tissue or other structures being subjected to the proposed dose,' <u>is</u>

<u>consistent with the ordinary and customary meaning of the term</u>."
(Report at p. 128; emphasis added)

- "<u>In short, the 'Summary of the Invention' indicates that the patentees use the term 'cost function' according to its ordinary and customary meaning</u>, than their description of formulas and variables similar to those of column 13 as optional indicates that 'cost function' should not be limited to the formulas or variables of column 13." (Report at p. 138; emphasis added)

- "<u>The '283 patent uses the term 'cost function' according to its ordinary and customary meaning</u>. That use is consistent throughout the claims and specification, both in connection with description of the prior art and the claimed invention. The patentees' general and inconsistent use of 'present invention' language throughout the specification does not require limiting 'cost function' to the particular formulas and variables of column 13. Rather, the patentees described the 'cost function' in much broader terms. Accuray's arguments to the contrary therefore must be rejected." (Report at p. 142; emphasis added)

- "As noted above, claim 25 is not the only claim that uses the term 'cost function.' Claim terms 'are normally used consistently throughout the patent,' *Phillips*, 415 F.3d at 1314, and <u>construing 'cost function' according to its ordinary and customary meaning provides the plainest reading of the claims</u> (asserted claim 29 is couched in means-plus-function language and is construed accordingly, as discussed separately below). In view of the foregoing, the term 'cost function' need not be defined as including the formulas and variables set out in column 13." (Report at pp. 142-143; emphasis added).

- <u>That sentence describes a "cost function" in a manner consistent with the patentees' use of that term to describe prior art cost functions, *i.e.*, that prior art cost functions "attribute[d] costs of radiation of various portions of both the tumor and surrounding tissues, or structures,</u>" and "consider[ed] the cost of under-exposure of tumor volumes relative to over-exposure of surrounding structures." <u>The general description of "cost function" is also consistent with Accuray's technical description of prior art cost functions, also described above</u>. (Report at p. 121; emphasis added).

The Special Master also addressed Accuray's suggestion that a construction of the term

"cost function" broader than the formulas and variables set forth in column 13, lines 4-39 would

render claim 25 invalid over the prior art.  The Special Master rejected this contention.  Report at p. 142.

The Special Master correctly stated that the issue of whether invalidity would result based on the construction of a claim term is not a matter for resolution in connection with claim construction, and further, that Accuray failed to identify any ambiguity in claim 25 that would invite construing the term "cost function" as Accuray proposed.  *Id*.  The Special Master then correctly concluded:

> The Federal Circuit has emphasized that "[u]ltimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Renishaw PLC*, 158 F.3d at 1250 (citations omitted).

*Id*.

Accuray failed to establish that claim 25 is ambiguous and that the cost function in claim 25 is necessarily limited to the formulas and variables identified at column 13, lines 4-39.  Report at p. 142.  Rather, based on a thorough and detailed review of the claim language, the specification, the use of the phrase "the present invention," the Detailed Description of the Invention, the Summary of the Invention, the Background of the Invention, the Abstract, and the prosecution history, the Special Master concluded that one skilled in the art at the time of the invention would have understood the meaning of the term "cost function" and that the use of the term "cost function" in claim 25 is to be in accordance with its ordinary and customary meaning.

**IV.    THE SPECIAL MASTER DID NOT ERR IN RECOMMENDING THAT CLAIM
25 IS NOT LIMITED TO SIMULATED ANNEALING OR
THE SARP ALGORITHM**

**A.    The Special Master did not err in concluding that one of the "primary" disputes
between the parties was whether claim 25 is limited to SARP.**

Accuray argues that the Special Master erred in concluding that "the primary dispute"

between the parties was whether claim 25 is limited to SARP.  It is unclear how this alleged error

has any relevance to the Court's decision to adopt, reject or modify the Special Master's Report.

Regardless of whether the instant issue was primary, secondary or tertiary, Accuray cannot

credibly argue that the issue of whether claim 25 is limited to the SARP algorithm was not an

important issue before the Special Master -- particularly in light of the fact that Accuray

continues to argue that the SARP algorithm must be read into almost every disputed claim term.

Additionally, Accuray complains that it was somehow prohibited from making a

complete presentation regarding this issue.  That is simply untrue, and Accuray had available to

it any time it wished, including an entire second day, to present its arguments.  More specifically,

Accuray fully argued and briefed the issue of whether SARP was a limitation to claim 25, and in

fact offered a demonstrative exhibit in support of the argument, which demonstrates that "SARP"

is mentioned six times in the '283 patent and the term "simulated annealing" is mentioned 21

times.  *See* Slide 32 of Accuray's Claim Construction Presentation; *see also* Transcript at p. 114.

As counsel conceded at the claim construction hearing, Accuray suggested a claim construction

in which the SARP algorithm was a limitation to be read into each claim element of claim 25:

> Mr. Peterson:    Let me just ask you, as we're going through these, I see that you
> have broken these down; a computer means, and then
> computationally obtained.
>
> Bottom line, though, aren't you contending that all these clauses
> mean a computer that is programmed to perform the SARP
> algorithm?

Ms. Jellins:      Yes, perform -- yes, configured to and running the SARP algorithm to perform the functions.

Mr. Peterson:     So, really, the bottom line, instead of going through each one of these or construing each term, couldn't you simply say that this -- we contend that this phrase means a computer programmed to perform the SARP algorithm?

Ms. Jellins:      Yes.  But I will tell you that the reason we broke it out was, again, because there was a contention that perhaps different algorithms could be used or that not the same algorithm would be used throughout.  And so we were trying to make it clear that we believed the language adapted to and then further adapted to and further adapted to and further adapted to all refers to running the same algorithm.  But I agree with you, an easier way to do it would be to say that the computer is running the SARP algorithm and it's performing these different functions.

Mr. Petersen:     I don't want to put words in your mouth, but at the end of the day, your contention is these claims are limited to running the SARP algorithm, right?

Ms. Jellins:      Yes.

Mr. Petersen:     So we can make a distinction on the record that Accuray's contention is, on all of these, simply that your proposed construction is a computer program to perform the SARP algorithm?

Ms. Jellins:      With respect to the language, the computer adapted to and further adapted to, yes.  We believe that there are other terms, of course, that need to be construed but, yes, we agree.

Transcript at pp. 136-138.

Counsel for Accuray again conceded that this was an important issue before the Special

Master:

Mr. Petersen:     Let me ask you, for each of those four limitations following comprising, starting with, quote, a computer, adapted to, yadda, yadda, yadda, close quote.  Computer further adapted to, and so forth.

As we just discussed, isn't it your contention that those limitations are limited to a computer that is programmed to perform the SARP algorithm?

Ms. Jellins:      Yes, in the sense that each of those limitations takes place during the SARP algorithm.

Mr. Petersen:   That's exactly what I mean.  So, when we say the first limitation, adapted to computationally obtain a proposed radiation beam arrangement, that's what the SARP algorithm does, right?

Ms. Jellins:      Yes.

Mr. Petersen:   The same way with the second limitation, adapted to computationally change the proposed radiation beam arrangement iteratively wherein yadda, yadda.  That, again, is the SARP algorithm, correct?

Ms. Jellins:      Yes.

Mr. Petersen:   Wouldn't it be just easier to say what we want the Court to decide is whether or not Claim 25 is limited to the SARP algorithm, yes or no?

Ms. Jellins:      That would be one thing that we would asking the Court to do. But I want to make clear that really, what – again, talking about is what is old and what is new, and the cost function is very important.  So not only would we ask the Court to limit it to the simulated annealing algorithm, but we would also ask the Court to limit the cost function to the disclosed formulas in Column 13. If you want me to move to that kind of shortcutting things, I would be happy to do that.

Mr. Petersen:   I don't really need to shortcut it.  What I'm really trying to do is get to the core underlying dispute between the parties.  If that core underlying dispute, the more and more read and hear, the core underlying dispute to me seems to be whether or not Claim 25 is limited to a computer program to perform the SARP algorithm.   What I hear you saying is, yes, that's the core dispute, and if the Court decides that, everything else, other than the cost function, will fall into place.

Mr. Jellins:      Actually, there are three core disputes, as we have learned today. So if I can address those.

One would be the SARP algorithm, you're absolutely correct.

The second would be the cost function, can it be any cost function or is it a cost function disclosed in Column 13.  What we've seen in the spec and would see in the slides is that over and over the spec refers to the cost function of the present invention.

|                | In fact, if you look at Column 13, maybe I can go to that quickly here -- |
|----------------|--------------------|

[ . . . ]

| Mr. Petersen: | So that's Question No. 2 for the Court, right? |
|----------------|--------------------|
| Ms. Jellins: | Yes.  And then the third question is, what does changing the beam weight mean?  Does changing the beam weight mean changing the beam weight for the beam intensity, or does changing the beam weight also include changing the beam, like adding a beam or removing a beam? |

Transcript at pp. 140-142.

As set forth above, not only did counsel for Accuray concede that limiting claim 25 to the SARP algorithm was a "core issue," it was counsel for Accuray who defined and numbered what she identified as the three core disputes.

Despite trying to deflect blame for counsel's concessions to the Special Master, Accuray has again demonstrated the significance of this issue in its Appendix A to Accuray's Objections (Doc. No. 154-1).  As shown in Appendix A to Accuray's Objections, simulated annealing, or SARP, is mentioned in nearly every one of Accuray's proposed constructions, and in some constructions, it is mentioned more than once.  This only highlights the significance of this issue, because without the terms "simulated annealing" or "SARP," Accuray's proposed claim constructions make no logical sense.

Accordingly, Accuray's argument that the Special Master erred in concluding that the only "primary dispute" between the parties was whether claim 25 is limited to SARP, is simply incorrect, and further, is irrelevant to the actual issue before the Court -- that is, whether to adopt, reject, or modify the Special Master's recommendations on claim construction.

**B.**      **The Special Master's plain meaning analysis does not violate *Phillips* and does not ignore the language of claim 25.**

Accuray argues that the Special Master failed to consider the claim language as a whole, failed to read the claim in context, and failed to appreciate the intrinsic and extrinsic evidence of the perspective of one skilled in the art.  Objections at pp. 23-24.  These allegations are not supported by the record or the Report.

As shown in great detail in the Report, the Special Master described the '283 patent in extensive detail (pp. 10-19), including an overview of the '283 patent, a lengthy summary of the background and description of the prior art, and an eight-page recitation of the Detailed Description of the Invention contained in the '283 patent.  In short, the Special Master did not fail to consider claim 25 in the context of the entire patent, and Accuray's characterization is unwarranted and unsubstantiated.

With respect to claim 25, the Special Master not only set forth the entire claim verbatim, but also set forth all of the disputed claim terms and each of the parties' proposed constructions.  Following the recitation of the claim language, the Special Master then discussed in great detail each of the parties' arguments with respect to whether claim 25 is limited to the SARP algorithm (pp. 33-40).  The recitation was followed by a discussion of the respective roles of the claim language and the specification under current precedent, including *Phillips*.  In fact, the Report discusses Accuray's contentions in detail a second time at pages 43-46.  Accordingly, Accuray cannot support its allegation that the Special Master failed to consider claim 25 as a whole, when there are literally dozens of pages in the report that discuss claim 25 in its entirety.

Accuray's final argument on this issue relates to the role of extrinsic evidence and the interpretation of intrinsic evidence from the perspective of one skilled in the art.  It is Accuray's argument that despite the fact that claim 25 does not mention any particular algorithm, much less

the SARP algorithm, "the express language of claims 25 and 29 requires a stochastic algorithm." Objections, p. 24.  Such an interpretation is not based upon the actual language of claim 25, but rather the opinions of Accuray's paid expert, Dr. Rosen.

Accuray argues that the Special Master's failure to adopt Dr. Rosen's report as the Special Master's claim construction violates *Phillips*.  Ironically, Accuray does not cite to *Phillips* in making this accusation.  Perhaps this is because *Phillips* does not support Accuray's contention.

As stated by the Federal Circuit in *Phillips*:  "[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.  […] [A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, the written record of the patent.'"  *Phillips* at 1318.  *Phillips* goes on to state:  "[While] extrinsic evidence 'can shed useful light on the relevant art,' we have explained that it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'"  *Id.* at 1317.

With respect to experts in particular, the *Phillips* Court stated:  "We have also held that extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person skilled in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."  *Id.* at 1318.

Accuray is not arguing that Dr. Rosen's testimony is required to establish that a <u>particular term</u> in claim 25 has a <u>particular meaning</u> in the pertinent field.  Rather, Accuray is arguing that

despite the absence of the words "simulating annealing" or the term "SARP algorithm" in claim 25, simulated annealing or SARP should nonetheless be read into the claim based upon Accuray's expert's opinion.  This would be a misapplication of *Phillips*.

With respect to the use of extrinsic evidence in claim construction, the *Phillips* Court warned:

> We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to reclaim terms, for several reasons.  First, extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning.  [ . . . ]  Third, extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in the intrinsic evidence.  The effect of that bias can be exacerbated if the expert is not one of skill in the relevant art or if the expert's opinion is offered in a form that is not subject to cross-examination.  [ . . . ]  Finally, undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the "indisputable public records consisting of the claims, the specification and the prosecution history," thereby undermining the public notice function of patents.

*Phillips* at 1318-1319 (citations omitted).

The *Phillips* Court also concluded:

> In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope and less considered in the context of the intrinsic evidence.  Nonetheless, because extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence.  In exercising that discretion, and in weighing all the evidence bearing on claim construction, the court should keep in mind the flaws inherent and each time of evidence and assess that evidence according.

*Id.* at 1319.

It should also be noted that Dr. Rosen did not testify at the claim construction hearing.

While he did present the tutorial on Accuray's behalf, he was not subject to cross examination, a

strategic decision made by Accuray's counsel, and therefore the opinions contained in his declaration must be construed in light of the warnings and instructions contained in *Phillips*.

Based on the above, Accuray's argument that the Special Master failed to correctly apply *Phillips* is unpersuasive.

Moreover, as the Federal Circuit stated in *Vitronics*, 90 F.3d at 1583: "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." The *Vitronics* Court went on to hold:

> In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention.

*Id.*, *citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978-79 (Fed. Cir. 1995); *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995).

Accordingly, the Special Master did not err in refusing to adopt Accuray's extrinsic, litigation-based expert opinions over the unambiguous intrinsic record.

**C.     The Special Master did not err in analyzing the language of asserted and non-asserted claims in construing claim 25.**

As it did with the term "cost function," Accuray again argues that the Special Master misapplied the doctrine of claim differentiation in addressing whether claim 25 is limited to the SARP algorithm.  In support of this allegation, Accuray argues that the Special Master's Report should be disregarded because the unasserted claims examined by the Special Master are method claims, as opposed to apparatus claims, like claim 25.  However, Accuray conveniently ignores the fact that the Special Master also analyzed claims 27 and 28, which are apparatus claims.

Claim 27 is a dependent claim that depends from claim 25, and claim 28 depends from claim 27. In short, Accuray's entire argument is incorrect.

Moreover, the Special Master considered the non-asserted claims in proper context – that is, as an objective source for determining the subject matter of the invention:

> Although differentiating between asserted and non-asserted claims may have been relegated in some cases to a "guideline" and not a "rigid rule" -- perhaps because in those cases the court chose not to apply that analysis -- evaluating the differences among claims remains an <u>objective</u> source for determining "the subject matter which the applicant regards as his invention."   §112(2).   Claim 25 is not by its express terms limited to SARP, and differences between various independent claims, which do not expressly call for SARP, independent claims, some of which do expressly call for SARP, indicate that claim 25 is not limited to SARP.

Report at p. 80 (emphasis in original).

**D.     The Special Master did not ignore the specification in providing the recommended construction.**

Accuray argues that the "repeated disclosures" in the specification require that the SARP algorithm must be read into claim 25, despite the express language of claim 25.  This argument is without merit, and is in direct contrast to *Phillips*, which Accuray concedes must be adhered to in all aspects of claim construction.  The *Phillips* Court stated:  "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."  *Phillips* at 1323.  "In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Id.*

The *Phillips* Court then explained:   "To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so."  *Id.*

As set forth in detail at pages 43-60 of the Report, the Special Master analyzed Accuray's arguments regarding the use of simulated annealing or SARP in the specification in light of not only *Phillips*, but other Federal Circuit precedent.

Accordingly, the Special Master did not err in recommending that claim 25 not be limited to the SARP algorithm, particularly in light of the fact that claim 25 (unlike other claims) is silent as to the optimization algorithm to be used.

E.    **The Special Master did not err in applying intrinsic evidence over extrinsic evidence in construing claim 25.**

Accuray argues that the Special Master "dismissed" the extrinsic evidence provided by Accuray.  In support of its allegation, Accuray intersperses Dr. Rosen's presentation during the tutorial section of the claim construction hearing and Dr. Rosen's declaration, as if both are extrinsic evidence to be afforded equal weight by the Court in claim construction.  However, as set forth above, Dr. Rosen's presentation during the tutorial was not subject to cross-examination, and therefore is not a reliable form of extrinsic evidence to be considered by the Court.  *See Phillips* at 1318.  Nonetheless, the Special Master examined Dr. Rosen's declaration in detail at pages 96-100 of the Report in conjunction with an analysis on the use of such extrinsic evidence in claim construction under the guidelines set forth in *Phillips*.  Based on the examination, the Special Master correctly concluded that Dr. Rosen's "testimony" regarding the use of only the SARP algorithm in the specification was clearly evident from a reading of the specification.    Further, the Special Master concluded that Dr. Rosen's opinion that the "additional experimentation" required to use the disclosed cost function with any other optimization algorithm than SARP, did not require that claim 25 be limited to the use of the SARP algorithm.   In conclusion, Dr. Rosen's testimony was contrary to the intrinsic record, namely the claims, specification and prosecution history relating to claim 25 and the '283 patent

as a whole.  Accordingly, Dr. Rosen's opinions were properly rejected as set forth in *Phillips* at 1318 ("[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'")

**F.    The Court should not reject the Special Master's construction of claim 25 in relation to simulated annealing or the SARP algorithm.**

Accuray contends that the Special Master erroneously construed claim 25 as not limited to simulated annealing or the SARP algorithm.  Accuray further argues that the Special Master erred in not tying his construction to a particular claim term.  Such an argument is ironic in that Accuray incorporated simulated annealing or SARP into nearly every claim term the parties identified as in dispute.  Moreover, Accuray claims that it asked the Special Master to construe the terms "*the computer adapted to*" and "*further adapted to*" separate and distinct from the issue of whether claim 25 is limited to the SARP algorithm.

In support of Accuray's argument, it cites to pages 132-138 of the Transcript from the claim construction hearing.  However, Accuray has conveniently ignored significant portions of the colloquy between the Special Master and counsel for Accuray.  In what appears from Accuray's Objections (pages 31-32) to be an uninterrupted quotation from the Transcript, Accuray actually excluded the following exchange:

> Mr. Petersen:    Let me just ask you, as we are going through these, I see that you have broken these down; a computer means, and then computationally obtained.
>
> Bottom line, though, aren't you contending that all of these clauses mean a computer that is programmed to perform the SARP algorithm?
>
> Ms. Jellins:    Yes, perform -- yes, configured to and running the SARP algorithm to perform the function.
>
> [ . . . ]

> Mr. Petersen:     I don't want to put words in your mouth, but at the end of the day, your contention is these claims are limited to running the SARP algorithm, right?
>
> Ms. Jellins:      Yes.

Transcript at pp. 136-137.

Accuray also ignored the later colloquy involving the specific terms "*the computer adapted to*" and "*the computer further adapted to*," which Accuray now contends the Special Master ignored.   In truth, counsel for Accuray conceded that its position that each of those limitations takes place during the SARP algorithm:

> Mr. Petersen:     So we can make a distinction on the record that Accuray's contention is, on all of these, simply that your proposed construction is a computer program to perform the SARP algorithm?
>
> Ms. Jellins:      With respect to the language, **the computer adapted to** and **further adapted to**, yes.  We believe that there are other terms, of course, that need to be construed but, yes, we agree.

Transcript at pp. 136-138 (emphasis added).

> Mr. Petersen:     Let me ask you, for each of those four limitations following comprising, starting with, quote, **a computer, adapted to**, yadda, yadda, yadda, yadda, close quote.  **Computer further adapted to**, and so forth.
>
>                   As we just discussed, isn't it your contention that those limitations are limited to a computer that is programmed to perform the SARP algorithm?
>
> Ms. Jellins:      Yes, in the sense that each of those limitations takes place during the SARP algorithm.
>
> Mr. Petersen:     That's exactly what I mean.  So, when we say the first limitation, adapted to computationally obtain a proposed radiation beam arrangement, that's what the SARP algorithm does, right?
>
> Ms. Jellins:      Yes.
>
> Mr. Petersen:     The same way with the second limitation, adapted to computationally change the proposed radiation beam

arrangement iteratively wherein yadda, yadda.  That, again, is the SARP algorithm, correct?

Ms. Jellins:        Yes.

Transcript at p. 140 (emphasis added).

In short, counsel for Accuray conceded that construction of the terms "*the computer adapted to*" and "*the computer further adapted to*" did not require additional construction other than whether those phrases were limited to include simulated annealing or the SARP algorithm. Therefore, the Special Master did not err in his recommended construction.

## V.      THE SPECIAL MASTER'S REPORT DID NOT FAIL TO ADDRESS OTHER CLAIM CONSTRUCTION ISSUES

Accuray now argues that the Special Master erroneously concluded that the parties narrowed the disputed issues to three issues, and as a result, the Special Master failed to construe "most of the disputed claim terms."  Objections at p. 32.  Accuray, of course, ignores the fact that it was Accuray's counsel who identified the three "core issues" for the Special Master and the Court to resolve.   Transcript at pp. 140-142.   Apparently unsatisfied with the Report, Accuray now takes issue with other claim terms that Accuray did not even address during the claim construction hearing.

It bears mention again that for most if not all of these terms, it was Accuray's proposed construction that included simulated annealing or the SARP algorithm.  If SARP is removed from Accuray's claim constructions, those constructions fail.  Moreover, Accuray ignores the fact that the constructions proposed by Best Medical relating to these terms were either that the term did not require construction or that the terms should be construed in accordance with their plain meaning.  *See* Joint Disputed Claim Term Chart (Doc. No. 131).

Moreover, as conceded by counsel for Accuray during the claim construction hearing, "there are some additional limitations which follow from the way the simulated annealing

algorithm works with respect to partial volume data, for example."   Transcript at p. 143. Obviously, if simulated annealing (or SARP) is not read into those terms as a limitation, Accuray's proposed construction must be rejected.

Furthermore, as stated by the Special Master at page 32 of the Report:

> The parties reduced the scope of the dispute during the *Markman* Hearing. With respect to the phrases beginning with "a computer, adapted to ***" "the computer further adapted to ***," "the computer further adapted to ***," and "the computer further adapted to ***," Accuray summarized its contentions as requiring that those terms meant "a computer program[med] to perform the SARP algorithm." *See Markman* Tr. at 138. Accuray argued that each of the functions that the recited computer was "adapted" to perform "takes place during the SARP algorithm." *Id.* Accuray agreed that the Court could simply decide "whether or not Claim 25 is limited to the SARP algorithm ***." *Id.* at 140. *See also id.* at 151 ("You can look at the claim as limited to the SARP family of algorithms with the preferred embodiment being fast simulated annealling [*sic*]. You can look at it instead as the disclosed embodiment being SARP and perhaps a little broader, the stochastic algorithms, but the point really is that the kind of algorithm you use has to match the cost function and that other non-stochastic algorithms won't work with the cost function.").

Accordingly, the Special Master addressed each of the issues that Accuray requested the Special Master to address.   In fact, the Special Master recognized that while Best Medical did not propose limiting the claim construction Report to these three "core" issues: "Best Medical expressed no disagreement that the master could resolve the parties' claim construction dispute with respect to claim 25 by addressing those three issues."   Report at p. 33.   Accordingly, Accuray received a response on the issues Accuray outlined to the Special Master, but simply does not like the result reached.   Accuray's displeasure is not a basis for rejecting the proposed claim construction recommended by the Special Master.

## VI.   THE SPECIAL MASTER DID NOT ERR IN HIS CONSTRUCTION OF "CHANGING THE BEAM WEIGHTS"

Accuray agrees with the recommended construction that the term "changing the beam weights" should mean "changing the beam intensity" and "not including changing the number or

position of beams."   Objections at p 33.   Accuray takes issue with the portion of the recommended construction that includes "including changing the beam weights to zero or non-zero."  *Id*.  In support of this objection, Accuray alleges that the Special Master misunderstood the teachings of Dr. Webb (Doc. No. 131-4).  *Id*.

In particular, Accuray argues that the Special Master misunderstood the difference between "beams" and "beamlets" when examining the Webb article.  *Id*.  However, Accuray ignores the actual text of the Webb article: "<u>The technique begins with all beam weights set to zero</u> and 'grains' of beam weight are offered at random to the beam elements."  Webb (1989) at 1352 (emphasis added).   "<u>The initial multi-element beam profiles were taken to be empty</u>. The resulting dose distribution was thus also empty."  *Id*. at 1358 (emphasis added).

Accordingly, the Special Master was correct in concluding that a beam at a given position may be given low weight, perhaps even a weight of zero, or conversely, starting from a zero beam weight to a quantifiable beam weight would effectively add a beam to the set.  Report at p. 156.

### VII.   THE SPECIAL MASTER DID NOT ERR IN HIS RECOMMENDED CONSTRUCTION OF CLAIM 29 REGARDING THE RECITED FUNCTIONS

Accuray argues that the Special Master's alleged failure to address certain terms in claim 25 also supports a rejection of the Special Master's proposed claim construction with respect to claim 29.  Accuray apparently forgets that it consented to the construction of claim 29 during the hearing, calling it "masterful."  Transcript at p. 150.

Claim 29 is written in means-plus-function language, and therefore it is to be construed in accordance with §112, ¶ 6.  The Federal Circuit has provided that the construction of such claims is different than the construction of claims which are merely structural claims:  "First, we determine the claimed function.  Second, we identify the corresponding structure in the written

description that performs that function." *JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005) (citations omitted).

As is clear from the pre-hearing briefs filed by the parties, step one was accomplished prior to the claim construction hearing when the parties agreed upon the function for each and every means-plus-function term in claim 29. *See* Joint Disputed Claim Term Chart (Doc. No. 131); *see also* Report at p. 163. As stated by the Special Master: "Best Medical subsequently agreed that the corresponding structure should be 'one or more computers configured to run the simulated annealing SARP algorithm,' plus the equivalence provided for under the statute." Report at p. 164. Accuray also agreed to that construction. *See* Transcript at p. 156 and Report at p. 164.

As stated during the claim construction hearing:

Ms. Jellins:      Yes, you do.  So, claim 29 it sounded like was --

Mr. Petersen:   I think we have done that.

Ms. Jellins:      Was pretty well resolved.  That was masterful.

Mr. Petersen:   I think we now have agreement between the parties, don't we?

Ms. Jellins:      Well, not agreement between the parties.

Mr. Petersen:   Well, this was your proposed construction.

Ms. Jellins:      You mean in terms of claim 29?

Mr. Petersen:   Yes.

Ms. Jellins:      Yes.

Mr. Petersen:   Good.

Transcript at pp. 150-151.

Counsel for Accuray went on to state that the Special Master also needed to address one additional issue, "the only thing that could possibly be new is this cost function and whether you

limit it to the simulated annealing algorithm, …" Transcript at p. 151.   The Special Master addressed this issue at page 164 of the Report:  "Claim 29 further requires that the cost function use partial volume data.  The only cost function algorithm disclosed in the '283 patent as using partial volume data is the cost function set forth in column 13, lines 4-39.  Accordingly, the 'corresponding structure' includes that cost function."

Accuray received the claim construction it proposed, as well as an additional construction with respect to the "cost function."  Accordingly, Accuray's arguments that the Special Master erred in his construction are baseless.

## VIII.   THE SPECIAL MASTER'S RECOMMENDATION ON INDEFINITENESS AS TO CLAIM 25 IS PROPER AND SHOULD BE AFFIRMED

Accuray argues that the Special Master erred in making recommendations on the indefiniteness of claim 25, "after the Court ordered separate briefing and consideration of the indefinite issue as to claim 29."  Objections at p. 34.  Accuray is conflating its indefiniteness argument with respect to claim 25 and the preference voiced by the Special Master and the Court that indefiniteness with respect to claim 29 be subject to subsequent briefing.

With respect to claim 29, Accuray argued that claim 29 was indefinite because the specification failed to adequately disclose the structure corresponding to each claimed function. This is an argument unique to means-plus-function claims under §112, ¶6, like claim 29.  *See, e.g.*, *Noah Systems, Inc. v. Intuit Inc.,* 675 F.3d 1302 (Fed. Cir. 2012), cited by Accuray during the hearing at pages 156-157.  These cases have no application to claim 25, which is an apparatus claim.

It is clear from the transcript that only the arguments of indefiniteness and invalidity of claim 29 were to be the subject of later briefing, not claim 25.  As stated by the Special Master: "After conferring with the Court, the preference is that on the indefinite issues in connection with

Claim 29, indefiniteness being under Section 112, Paragraphs 2 and 6, **in the context of whether or not the disclosed algorithm is sufficiently disclosed to render the claims and the claims definite or rather not sufficiently disclosed to render the claims indefinite, the preference is to have that separately briefed by the parties in a separate motion**."   Transcript at p. 157 (emphasis added).

There was no discussion regarding additional briefing or argument on Accuray's contention that claim 25 is indefinite under §112 ¶ 2.  On that issue, Accuray argued that claim 25 is invalid under §112, ¶ 2 because it improperly combines two separate statutory classes of invention.  *See* Accuray Claim Construction Brief (Doc. No. 138) at p. 59.  Accuray argued that claim 25 is invalid because it is an improper "hybrid" claim allegedly combining two separate statutory classes of invention.  *Id.*

Accuray fails to acknowledge to the Court that its argument relating to claim 25 as an allegedly improper hybrid claim was argued at the claim construction hearing.  *See* Transcript at pp. 124-126.  Moreover, the Special Master at pages 180-186 of his Report thoroughly analyzed the applicable case law and Accuray's arguments with respect to its allegation that claim 25 is an improper hybrid claim.

Accordingly, Accuray fully briefed and <u>argued</u> its contention that claim 25 is indefinite as an improper "hybrid" claim at the claim construction hearing.  The issue was thus ripe for resolution by the Special Master, and therefore, no further briefing or argument is required.  Significantly, Accuray cannot point to any portion of the Report or the Transcript where the Special Master or the Court indicated that it would reserve ruling on Accuray's indefiniteness arguments <u>with respect to claim 25</u>.  Rather, the only discussion regarding later briefing related to a separate and distinct argument raised by Accuray <u>with respect to claim 29</u> under §112, ¶ 6.

Accordingly, Accuray's objection is misplaced and there is no need for additional briefing or argument to the Court.

## IX.    <u>CONCLUSION</u>

For the reasons set forth above, Best Medical respectfully submits that Accuray's Objections be overruled and that this Court adopt the Special Master's Report and Recommendation on Claim Construction in its entirety as the opinion of this Court.

Respectfully submitted,

Dated: <u>November 6, 2012</u>         By: <u>*/s/ Eric G. Soller*</u>
                                        Eric G. Soller, Esq.
                                        Alan G. Towner, Esq.
                                        PIETRAGALLO, BOSICK & GORDON LLP
                                        38th Floor, One Oxford Centre
                                        Pittsburgh, PA  15219
                                        egs@pietragallo.com
                                        agt@pietragallo.com


                                        *Counsel for Plaintiff, Best Medical*
                                        *International, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2012, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the

following:

Madison C. Jellins, Esq.
Janice A. Christensen, Esq.
Jellins Christensen LLP
228 Hamilton Avenue, 3rd Floor
Palo Alto, CA  94301
and
Jellins Christensen LLP
50 Main Street, Suite 100
White Plains, NY  10606
Email: mjellins@jciplaw.com
Email: jchristensen@jciplaw.com

Kirsten R. Rydstrom, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA  15222
Email: krydstrom@reedsmith.com

By: */s/ Eric G. Soller*
    Eric G. Soller, Esquire
    *Counsel for Plaintiff, Best Medical*
    *International, Inc.*